## UNITED STATES COURT DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 09-CR-10206-WGY** |
| | ) | |
| **DEWANE TSE** | ) | |

## MOTION TO VACATE PLEA PURSUANT TO 28 U.S.C. § 2255 AND MOTION TO STAY PROCEEDINGS PENDING RELEASE OF INSPECTOR GENERAL REPORT

Defendant Dewane Tse ("Tse") moves under 28 U.S.C. § 2255 to vacate his guilty plea.  As grounds, defendant states that his rights to due process were violated where (1) his plea was not knowing, voluntary and intelligent under Brady v. United States, 397 U.S. 742 (1970) and Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006) because he entered the plea unaware of government misconduct at the Hinton Drug Lab.

## BACKGROUND

### I.   TSE'S JANUARY 4, 2010 PLEA

Dewane Tse pled guilty on January 4, 2010 to a two-count indictment alleging that on May 15, 2009 he Distributed Cocaine and Possessed Cocaine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1). On May 11, 2010 Tse was sentenced to 21

1

months imprisonment and 3 years of supervised release.[1]

Prior to entering his guilty plea, defendant was provided with a certificate of analysis stating that the alleged controlled substance had been tested by chemists at the William A. Hinton State Laboratory Institute ("the lab") and found to contain cocaine (Exhibit A).

The government's case against Tse rested squarely on the testing conducted by laboratory chemists and their conclusion that the suspected drug evidence contained cocaine: The content of the suspected drug evidence was a critical piece of the government's case.

## II. MISCONDUCT AT THE HINTON LABORATORY

On August 30, 2012, the Massachusetts Department of Public Health's ("MDPH") William A. Hinton Laboratory ("the lab") was abruptly closed after investigation revealed that Annie Dookhan, the lab's most prolific chemist, engaged in widespread official misconduct which compromised the validity of thousands of drug test results.  Dookhan was later charged with twenty-nine

---

[1] On March 1, 2011 Tse was found in violation of his supervised release, sentenced to 30 days of incarceration concurrent to a state sentence being served, and 36 months of supervised release to include 90 days of home confinement and mental health counseling. On June 6, 2012 the Court approved a United States Probation Office request to modify the conditions of Tse's supervised release to add substance abuse counseling. On August 30, 2012 Tse's probation was transferred to the District of Rhode Island.

separate crimes, including perjury, obstruction of justice, tampering with evidence, and falsely claiming to hold a degree (Exhibit B).  Shortly after the lab closed, Dookhan's immediate superior was fired and both the lab's director and the Commissioner of Public Health were forced to resign (Exhibits C & D).  Governor Patrick ordered a "file-by-file" review of every case Dookhan handled, and assigned Inspector General Glenn Cunha to conduct a comprehensive review of the lab (Exhibits E & F). These investigations are ongoing.  The lab remains closed and the remaining analysts are on administrative leave and have not been allowed to resume testing duties.  The Inspector General's report is expected later this year.

**A.    Background of the Hinton Drug Lab Scandal.**

In June 2011 Annie Dookhan's immediate superiors discovered that she had accessed the evidence safe without authorization, removed 90 drug samples, and subsequently forged a co-worker's initials on the evidence log after the breach was discovered. Dookhan's superiors did not report her misconduct to the MDPH Commissioner's Office or General Counsel for almost six months, due to their perception that Dookhan was a high-achieving, reliable employee and that this was an isolated incident.[2] Instead, Dookhan was allowed to finish her outstanding tests,

---

[2] Exhibit G at 337-338.

then removed from testing duties and assigned to write protocols
for the laboratory.

MDPH General Counsel first learned of Dookhan's misconduct
in December 2011 during planning meetings in preparation for the
previously-scheduled transfer of the forensic drug laboratory to
the State Police Crime Laboratory.[3]  At that point MDPH conducted
a limited internal investigation into the incident which
concluded that Dookhan "failed to follow laboratory protocols for
the transfer of samples and subsequently created a false record
of the transfers."[4]  In February 2012 Linda Han, MDPH's Bureau of
Laboratory Sciences Director, sent two letters to prosecutorial
agencies associated with the 90 samples about Dookhan's breach
and her subsequent falsification of logs.[5]  Dookhan was placed on
administrative leave of absence on February 21, 2012 and formally
terminated as of March 9, 2012.[6]

In August 2012 EOPSS and the Attorney General began their

---

[3] Exhibit G at 337. The functions and personnel of the
Hinton forensic drug lab were to be transferred to the Executive
Office of Public Safety and Security ("EOPSS") and to become part
of the State Police Crime Laboratory effective July 1, 2013.  As
staff on the proposed transfer list were reviewed, Dookhan's
immediate superiors shared information about her misconduct with
MDPH and identified Dookhan as someone who would not be part of
the transfer.

[4] Exhibit G at 338.

[5] Exhibit H.

[6] Exhibit G at 339.

own criminal investigation of Dookhan, which quickly resulted in the lab's closure.

**B.   Dookhan's Misconduct.**

To date, several thousand pages of discovery have been produced regarding Dookhan and the lab.[7] In broad strokes, the discovery reveals that, among other things, Dookhan:

a)   Admitted to law enforcement that for several years, she had been "dry-labbing"(i.e., simply certifying, without testing, that the substance was the suspected drug) (Exh. J at 71-74, 77);

b)   Admitted that she laid out samples from different cases on her bench at the same time and grouped them by the type of suspected drug. (Id.) This allowed for cross-contamination as well as compromising the chain of custody;

c)   Admitted that she "batched" samples together and tested some but not others, then simply labeled the others as the drug she suspected it of being (Id.);

d)   Admitted that when the gas chromatograph / mass spectrometer ("GC/MS") machine did not confirm her "result," she would intentionally contaminate the sample by using a known drug from a completed test which she stored at her bench (Id.)[8];

_____

[7] The United States Attorney's Office has transmitted discovery about the lab produced by the Massachusetts Office of the Attorney General.  Selected portions of this discovery produced by the Office of the Attorney General are submitted as Exhibits G through R.  References will be made to specific bates numbered pages, as well as paragraphs, where appropriate.

[8] At the time the lab utilized a two-chemist system: The primary chemist (also known as the "custodial chemist") was responsible for weighing the sample and conducting bench-top tests such as reagent color tests, microcrystalline analyses, and ultraviolet visualization.  After conducting these tests the primary chemist prepared a vial containing a small amount of the

e)   Had a key to the evidence safe;[9]

f)   Admitted that she had access to the evidence database (Exh. J at 72);[10]

g)   Admitted that when she was discovered in possession of 90 drug samples that were not properly signed out to her, she falsified an evidence officer's initials in the evidence log book (Exh. J at 71-72);

h)   Admitted that she falsified other chemists' initials on quality control documents for the GC/MS machine (Exh. J at 72);[11]

I)   Failed to properly run the quality control test samples for the GC/MS machine, and instead falsely certified that she had done so (Exh. I at 8 ¶ 13 & 22 ¶ 5);

j)   Failed to properly calibrate balances, which are used to ensure the accuracy of the drug weights measured by the chemist (Exh. I at 23 ¶ 9);

k)   Communicated directly with prosecutors about specific

---

sample and transferred that vial to the secondary chemist to run it through the CG/MS machine. The primary chemist retained the remaining portions of the evidence samples (Exh. G at 334-335).

[9] Investigators determined that Dookhan's key opened the evidence safe, and that supervisors did not replace the safe's lock until December 2011, six months after her initial misconduct was discovered in June 2011 (Exhibit K). Dookhan also admitted to a co-worker that she knew the evidence safe code, an alternative way to access the safe. (Exh. I at 32 ¶ 8).

[10] A computerized database kept a record of samples that were submitted to the lab.  When a sample was signed out to a chemist for testing, a record of the transfer was recorded in both the database and a separate logbook stored in the evidence office. When a chemist returned samples after testing this was documented in both the database and the logbook (Exh. G at 334-335).

[11] See also Exh. I at 5-6 & 22 ¶ 4 (Dookhan forged Daniel Renczkowski's initials on a GC/MS "control sheet"); Exh I at 40 ¶ 3 (Dookhan forged Nicole Medina's initials on a GC/MS "tune" report); Exh. I at 45 ¶ 2 (Dookhan forged Kate Corbett's initials on GC/MS "batch sheets" on a number of occasions).

cases, and displayed a prosecutorial bias.[12]

l)     Falsely stated on her curriculum vitae that she had
       received a Master of Science in Chemistry from the
       University of Massachusetts (Exhs. B & N);

m)     Falsely testified under oath on a number of occasions
       (Exh. B).

The laboratory's internal statistics revealed that Dookhan's
testing volume was vastly out of proportion with the other
chemists:  In 2004, the first full year she was on the job,

---

[12] Dookhan communicated directly with prosecutors about
specific samples, agreeing to analyze them more quickly, out of
order, despite the fact that this was not proper procedure. (Exh.
I at 24, ¶¶ 1 & 4, 29 ¶ 11, 32 ¶ 4, 37 ¶ 3, 40 ¶ 5 and Exh. J at
72 ¶ 6). Dookhan also provided lists of predicate questions for
prosecutors to ask her during direct examinations, sometimes
advising prosecutors to "avoid questions that deal with
accreditation, publications, and external training." See Exh. L
(select Dookhan emails providing predicate questions).

    In addition, many of Dookhan's emails show her bias toward
the prosecution.  For example, after Dookhan faxed information on
two of his cases, one federal prosecutor commented "Annie -
thanks. Sorry to be bothersome lately.  But the Summer approaches
and we need to take some of these guys off." Dookhan responded:
"No problem.  I have the same attitude . . . get them off the
streets." In another example, Dookhan commented "Haha!! My all
time favorite excuse, Boston case 'It's not mine, I was holding
it for my girlfriend.'" Dookhan also comments that it "sucks"
that a prosecutor received a hung jury; congratulates a
prosecutor who tells her that the defendants in her case pleaded
guilty and "will be enjoying Dedham House of Corrections soon";
comments that a prosecutor should "[t]ell the defendant, he is
getting an extra 5 years for p-off the chemist" and states that
"all defendants that default needs to get an additional 10
years".  Ms. Dookhan also received e-mails from prosecutors which
refer to various defendants as (1)"this jack @ss"; (2)"idiot(s)";
(3) a "habitual criminal"; (4) "very bad guys"; (5) "the nitwit";
and (6) "kind of a jerk." See Exh. M (select Dookhan emails
evidencing bias).

Dookhan tested 9,239 samples, while the next most productive chemist tested only 6,262 samples (Exh. G at 342). In 2005, she tested 11,232 samples, and the next most productive chemist tested only 6,053 samples (Id.).  One chemist told investigators that while most chemists were testing 50 to 150 samples per month, Dookhan was testing over 500 samples per month, but that there were not enough slides in her discard pile to correspond with those high numbers (Exh. I at 19 ¶¶ 4-5). Another noted that he never saw her in front of a microscope, although that is how the chemists performed micro-crystal tests on cocaine samples (Exh. I at 21 ¶ 1).[13] Although the productivity of the other lab chemists decreased after the Supreme Court's decision in Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) because of time spent on court appearances, Dookhan's productivity actually increased:  In 2010 Dookhan tested 10,933 samples while the second most prolific chemist tested 3,839 (Exh. G at 342). In total, from 2004-2011 Dookhan was responsible for 25% of the laboratory's total analyses and completed 21.8% of all tests conducted by staff (Exh. G at 341-342).

Given the lack of adequate documentation and quality control

---

[13] See also Exh. I at 32 ¶ 6 (Hevis Lleshi, Dookhan's trainee reported that Dookhan would appear to obtain micro-crystal results quickly, but would not let Lleshi look at the crystals under a microscope. Lleshi was unable to replicate the speed at which Dookhan obtained the crystals. When Dookhan did let Lleshi look under Dookhan's microscope, it would take her a much longer time to obtain the crystals).

procedures at the laboratory, the true scope of Dookhan's
misconduct may never be fully known.  What is known is that
Dookhan's excessively high testing volume belies her self-serving
statement to law enforcement, when confronted with proof that she
had falsified the results in a specific case, that she only
contaminated samples "a few times." (Exh. J at 73).  Throughout
her tenure at the lab Dookhan had unfettered access to evidence:
Her key opened the evidence safe (Exh. K; Exh. I at 32 ¶ 8). She
also had access to the evidence database.[14]  She had unrestricted
access to drug "standards" (known samples of particular drugs
used in the CG/MS machine for comparison (Exh. I at 22 ¶ 2)).[15]
Moreover, Dookhan's access to the laboratory, safe, and the
database continued even after she was removed from testing duties
in June 2011.[16]

---

[14] Dookhan admitted to law enforcement that she had access
to the evidence database (Exh. J at 72). Co-workers also reported
that Dookhan could access the database (Exh. I at 42 ¶ 3, 46 ¶
4). Dookhan was also seen going into the safe alone, giving out
samples, and entering data on the evidence computer (Exh. I at 12
¶ 5, 50 ¶ 5-6). It is presently unknown whether Dookhan accessed
the evidence safe on other occasions and altered the database to
hide her conduct.

[15] Part of Dookhan's responsibilities at the lab was to
prepare vials of these "standard" drugs for use in the CG/MS
machine Id.

[16] Dookhan admitted to law enforcement that she continued to
access the evidence database after being removed from testing
duties (Exh. J at 72). She also boasted to a state court
prosecutor in an email in November 2011 that "I have access to
anything and everything." See November 15, 2011 Email to Debra
Payton (Exh. M).  Other chemists observed her in the lab (Exh. I

C.    **Lack of Quality Control At the Laboratory**.

The Inspector General is currently conducting a comprehensive review of the laboratory in general, and a report is expected to be released later this year.  MDPH's own internal review, conducted in the wake of the lab's closure, found a number of "vulnerabilities" at the lab, including lack of accreditation, insufficient quality control oversight, outdated and vague protocols, insufficient safeguards on access to the evidence room and safe, absence of camera surveillance, lack of a mechanism to track chemists' discrepancies or adverse results, and lack of close supervision from supervisors (Exh. G).

Accreditation would have required standards for training, personnel, equipment and instrumentation, and would also have required chemists to keep more detailed data regarding the testing process (Exh. G at 333).  However MDPH purportedly lacked the funds necessary to pursue accreditation. Id. The protocols that the lab did have in place were both outdated and too generalized "to guarantee[] the type of integrity needed to deliver high-quality forensic drug analyses." (Id. at 332-333).[17]

_____

at 23 ¶ 12, 35 ¶ 6, and Exh. J at 86 ¶ 3;), in the GC/MS area (Exh. I at 40 ¶ 5, 46 ¶ 5) and compiling data for discovery (Exh. I at 46 ¶ 5) after June 2011.

    [17] The lab's protocols were drafted in 2004 and based upon the recommendations of the Scientific Working Group for the Analysis of Seized Drugs ("SWGDRUG").  Although SWGDRUG recommendations have been consistently updated, most recently in 2011, the lab's protocols had not followed suit. In addition,

In addition, in 2008 budget cuts had forced MDPH to eliminate
their quality control division, which oversaw all 18 MDPH
laboratories within the Bureau of Laboratory Sciences, and to
decentralize the quality control function to each individual
laboratory (Id. at 333).  Essentially, these laboratories,
including the forensic lab at issue here, were left to police
themselves.  Ironically, Dookhan herself had quality control
responsibilities at the lab (Exh. J at 71 at ¶ 1; Exh. I at 22 at
¶ 2; Exh. R).

The laboratory's documentation procedures were so poor that
potentially exculpatory data was not disclosed to either
prosecutors or defense attorneys on a regular basis.  As noted
above, the laboratory did not maintain an adverse events log.
Thus they did not have a mechanism in place to capture instances
where secondary GC/MS testing failed to confirm a primary
chemist's conclusion.  In those instances, the confirmatory
chemist would return the sample to the primary chemist for the
primary chemist to "resolve the discrepancy" (Exh. G at 341; Exh.
I at 6 ¶ 6). Dookhan has admitted to resolving her discrepancies
by contaminating evidence.  There was no procedure in place to
reconcile or even compare the data of a second run of a sample on

---

MDPH's review noted that even if the lab had complied with the
SWGDRUG guidelines, those guidelines were too vague and
inadequate to  "guarantee[] . . . the type of integrity needed to
deliver high quality forensic drug analyses." (Exh. G at 332).

the CG/MS machine with the first, to ensure the results of the second run were accurate.  The only place that a discrepancy between the primary chemist's result and confirmatory CG/MS testing might be noted was on the back of an index card known at the "control card."  However, the chemists, who typically provided discovery to the prosecuting attorneys on their own cases, apparently only transmitted the *fronts* of the control cards in the discovery packet.[18]  Thus, any discrepancy would presumably be unknown to both the prosecutor and, in turn, to the defense attorney.

The lack of evidentiary integrity is further evidenced by the fact that the lab supervisor later discovered that a number of chemists' keys, not just Dookhan's, opened the safe door, despite the fact that only evidence officers were authorized to access the safe,[19] as well as the fact that after the lab's closure investigators found drug samples scattered about the lab, including in desk drawers, taped to lab cabinets, and even within boxes of files the Attorney General sent for scanning (Exh. Q).

---

[18] See Exh. O at 669-670 (only the fronts of the evidence control card sent in the discovery packet); Exh. P at 641 (stating that "the only place [a return to chemist] would be documented is on the original control sheet and on the back of the card, neither of which is sent to lawyers in the discovery packet" and also noting that a different confirmatory chemist might analyze the sample the second time); See also Id. at 645-646.

[19] Exh. K; Exh. G at 340; Exh. I at 12 ¶ 4, 23 ¶ 13, 37 ¶ 8, and 38 ¶ 12).

Finally, it is clear that oversight and supervision were practically non-existent, as demonstrated by the lab supervisors' failure to monitor Dookhan's unusually high volume of testing (Exh. G at 341-342); failure to respond appropriately to information that she falsified coworkers' initials on quality control documents (Exh. I at 6 ¶ 4, 15 ¶ 9 and 22 ¶ 5); failure to report Dookhan's breach of the evidence safe and falsification of logs to the MDPH Commissioner's Office for six months (Exh. G at 336-339, 343); and failure to safeguard the evidence safe until six months after the breach (Exh. K).  The Hinton laboratory's vulnerabilities were systemic and pervasive and compromised the reliability of all its test results.

## GROUNDS FOR RELIEF

### A.   DEFENDANT'S GUILTY PLEA SHOULD BE VACATED UNDER 28 U.S.C. § 2255 BECAUSE IT WAS NOT VOLUNTARY, KNOWING, AND INTELLIGENT

A prisoner may move a court to vacate or set aside his conviction and/or sentence under 28 U.S.C. § 2255 where he is in custody under sentence of a court established by Act of Congress, and claims that the sentence was imposed in violation of the Constitution or laws of the United States.  28 U.S.C. § 2255; United States v. Colon-Torres, 382 F.3d 76, 85, n. 8 (1st Cir. 2004).  Fed. R. Crim. P. 11(e) provides that a guilty plea may be set aside under 28 U.S.C. § 2255 ("After the court imposes

sentence, the defendant may not withdraw a plea of guilty or nolo
contendere, and the plea may be set aside only on direct appeal
or collateral attack.")

Because a defendant who enters a guilty plea "simultaneously
waives several constitutional rights," McCarthy v. United States,
394 U.S. 459, 466, (1969) due process requires that the
defendant's entry of a guilty plea be a voluntary, knowing, and
intelligent act, "done with sufficient awareness of the relevant
circumstances and likely consequences." United States v. Noriega-
Millan, 110 F.3d 162, 166 (1st Cir. 1997).

A guilty plea is involuntary if induced by misrepresentation.
Brady v. United States, 397 U.S. 742, 755 (1970).  Citing Brady,
the First Circuit has held that a guilty plea is involuntary
where (1) the government or its agents committed some egregiously
impermissible conduct that antedated the entry of the plea; and
(2) the misconduct was material to the defendant's choice to
plead guilty.  Ferrara v. United States, 456 F.3d 278, 290 (1st
Cir. 2006).  In analyzing whether the misconduct was material to
the defendant's choice to plead guilty, a court must determine
whether there is a "reasonable probability the defendant would
not have pleaded guilty" had he known about the misconduct.  Id.
at 294.

Drug samples in petitioner's case were tested at the Hinton
Drug Lab.  There is substantial evidence that one chemist at the

Hinton Lab, Annie Dookhan, made blatant misrepresentations:  she
has admitted to, inter alia, dry labbing, forging, recording
false data, and intentionally contaminating sample substances
that had tested negative for drugs in order to make them
positive.   Moreover, the Hinton Lab generally is the subject of
a forensic investigation being conducted by Massachusetts
Inspector General Glenn Cunha.   Periodic releases of discovery by
the Massachusetts Attorney General's Office have indicated that
the laboratory lacked any type of independent accreditation,
maintained outdated operating procedures, and lacked any
independent quality assurance or quality control procedures.
There were insufficient safeguards on access to the evidence
room, safe, and evidence database. A number of chemists' keys
opened the evidence safe.   In addition, recent discovery
indicates that drugs were found scattered throughout the lab,
including on the floor, in desk drawers and filing cabinets, and
within files that were sent by the Inspector General for scanning
by an independent vendor (Exh. Q). Protocols did not limit a
chemist to removing and analyzing samples from a single case and
returning them to the evidence room before removing and analyzing
samples from another case. Additionally, throughout the lab there
was a uniform failure to adequately document adverse events and
thus a failure to disclose potentially exculpatory data to
prosecutors and defense attorneys.  Cf. Ex Parte Patrick Lynn

<u>Hobbs</u>, 393 S.W.3d 780 (Tex. 2013)(habeas granted on due process grounds in drug possession case where forensic scientist did not follow accepted standards when analyzing evidence; though evidence remained to retest, because the evidence had been in custody of technician, custody was compromised, and due process violated).

The conduct at the Hinton Lab was egregiously impermissible. The conduct took place before petitioner's plea and without his knowledge. The period of time during which the misconduct occurred was at least 2003 through the lab's closure. Petitioner plead guilty on January 4, 2010. The information about the misconduct is powerful impeachment evidence which could have supported a decision to go to trial, because it severely undercut the validity of drug certifications used to establish an element of petitioner's offense. As a result, petitioner's plea was not voluntary, knowing, and intelligent.

<u>**CONCLUSION**</u>

Defendant may seek to supplement this motion at a later date when more facts are discovered about the laboratory. Defendant files this motion based on the urgency of newly-discovered evidence and does not intend to waive any other claims.

Defendant respectfully requests that the court vacate defendant's plea and order a new trial; and further that the

16

court allow defendant to supplement this motion with additional material uncovered by further investigation of the drug lab and discovery received from the government.

As noted above, a report detailing the results of that investigation is expected at the end of September, 2013. Accordingly, petitioner requests that this Court stay the proceedings until after the Inspector General's report is issued to allow counsel time to assess the findings of that report.

> **Respectfully Submitted,**
> **DWANE TSE**
>
> */s/ Jane F. Peachy*
> **Jane F. Peachy**
> **B.B.O. #661394**
> **Federal Defender Office**
> **51 Sleeper Street, 5th Floor**
> **Boston, MA 02210**
> **Tel: 617-223-8061**

## CERTIFICATE OF SERVICE

I, Jane F. Peachy, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)on August 27, 2013.

> */s/ Jane F. Peachy*
> **Jane F. Peachy**